931 P.2d 1133

STATE of Arizona, Appellee,

v.

Joe Christol CURRY, Appellant.

Nos. 1 CA–CR 94–0617, 1 CA–CR 95–0056.

Court of Appeals of Arizona,
Division 1, Department C.

Sept. 10, 1996.

Review and Cross–Petition for
Review Denied Feb. 26, 1997.

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, and Colleen L. French, Assistant Attorney General, Phoenix, for Appellee.

Dean W. Trebesch, Maricopa County Public Defender by Carol A. Carrigan, Deputy Public Defender, Phoenix, for Appellant.

## OPINION

SULT, Judge.

Joe Christol Curry ("defendant") appeals from his convictions and sentences on one count of attempted second degree murder, two counts of sexual conduct with a minor, and one count of sexual abuse. For the following reasons, we vacate the conviction for attempted second degree murder and remand for a new trial. We affirm the remaining convictions and sentences.

## FACTUAL AND PROCEDURAL BACKGROUND

For several years, defendant and his wife, Francine Curry, remained married but lived separately. They had six children together, the oldest of whom is their daughter, C, born in 1981. At some point in 1991 or 1992, C revealed to Francine that defendant had been "messing" with her. Francine did little or nothing in response to this and several subsequent disclosures of sexual misconduct, and defendant continued to have sexual relations with C. In July 1992, both Francine and C's maternal grandmother finally called Child Protective Services ("CPS") after Francine observed genital warts on C. A CPS case worker contacted Francine and two other family members, but did not interview C or defendant. CPS unaccountably took no other action at that time.

In September 1992, Francine brought C to the primary care facility of the Maricopa County Medical Center for treatment of C's asthma condition. During the examination the physician asked whether C was sexually active, and Francine responded, "Not with boys, but ... I found out her father's been messing with her." The following day, police interviewed C and learned details of defendant's sexual conduct with her. A police investigation ensued.

C and her siblings spent the night of November 21, 1992, at defendant's house where he had sexual intercourse with her. When defendant returned the children to Francine's apartment the following day, C told Francine what had happened. Wielding a kitchen knife, Francine confronted defendant in the front yard of the apartment complex. Defendant pulled out a gun and a struggle ensued during which Francine was shot in the chest and had her skull fractured. Francine did not die, however, and defendant was arrested and jailed.

On December 2, 1992, a Maricopa County grand jury indicted defendant for attempted second degree murder. On June 3, 1993, another grand jury indicted defendant for six counts of sexual conduct with a minor, two counts of sexual abuse, and one count of child

molestation, all based on incidents involving C. The cases were consolidated and proceeded to a jury trial. With respect to the sex crimes, the state relied on testimony by C, her younger sister ("S"), physicians, a criminalist, police investigators, and an expert on Child Sexual Abuse Accommodation Syndrome. The testimony of Francine, C, some of Francine's neighbors and the investigating officers was offered to prove the attempted murder charge. Defendant testified and denied having any sexual contact with C. He also denied shooting or hurting Francine, although he admitted being nearby when she was shot. Defendant also relied on the defenses of alibi and good character.

The trial court dismissed the molestation count. The jury acquitted defendant on five of the remaining sex charges, but convicted him of attempted second degree murder, two counts of sexual conduct with a minor, and one count of sexual abuse. The trial court sentenced defendant to consecutive, aggravated sentences on each count, totalling seventy-six years imprisonment. Defendant timely appealed and this court has jurisdiction pursuant to Arizona Constitution, article VI, section 9 and Arizona Revised Statutes Annotated ("A.R.S") sections 12–120.21(A) (1992), 13–4031 (1989), and 13–4033 (Supp. 1995).

## ISSUES PRESENTED

Following the submission of this appeal, we requested supplemental briefing directed to whether, in Arizona, there is such a crime as attempted reckless second degree murder and, if not, whether it was fundamental error for the trial court to have instructed on such a crime. In its supplemental brief, the state has raised a question as to our jurisdiction to order such briefing. The state asserts that with the repeal of A.R.S. section 13–4035 (1989), which obliged us to search the record for fundamental error, this court no longer can require the parties to assist it in a search for fundamental error. Thus, the issues raised by the state, the court and defendant are:

1. Whether this court has jurisdiction to order supplemental briefing on an issue raised by the court;

2. Whether in Arizona there is a crime of attempted reckless second degree murder;

3. Whether the trial court properly admitted opinion testimony on "Child Sexual Abuse Accommodation Syndrome;"

4. Whether the trial court properly admitted opinion testimony by a physician who did not personally examine the victim;

5. Whether there was sufficient foundation to admit evidence pertaining to certain bullets;

6. Whether the trial court was within its discretion in amending the indictment to conform to the evidence;

7. Whether prosecutorial misconduct and judicial bias deprived defendant of a fair trial; and

8. Whether the trial court relied on inappropriate factors in aggravating defendant's sentence.

## DISCUSSION

### 1. Jurisdiction to Order Supplemental Briefing.

We are at a loss to understand why the state would argue that when this court, on its own motion, notes an issue not addressed by the parties, it should not ask for assistance from the parties and thus give them an opportunity to be heard on the issue. The state does not argue, nor could it, that simply because we no longer have an *obligation* to search for fundamental error, we have no *right* to address such error when we see it. *See* A.R.S. § 13–4036 (1989) (On appeal from judgment of conviction, the supreme court "may ... make any order which is consistent with the justice and the rights of the state and the defendant."); *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936) ("In exceptional circumstances, especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings."). Yet the state's argument, if correct, would require us to resolve such an issue entirely on our own with no

assistance from counsel and no opportunity for the parties to be heard on the issue.

■ The state has cited no authority in support of its argument. By the same token, we have not found a specific rule of court, statute, or case pronouncement which specifically authorizes us to order the parties to an appeal to submit supplemental briefing on an issue raised *sua sponte* by the court. Perhaps this is so because the state's argument runs so counter to notions of procedural due process and the status of counsel as officers of the court that no such rule has ever been thought necessary. In any event, we now hold that when an appellate court notes the possibility of fundamental error in a criminal proceeding, it may raise the issue on its own motion and order the parties to submit supplemental briefs addressing the issue.

### 2. Attempted Reckless Second Degree Murder.

In this case, the trial judge instructed the jury that it could convict defendant of attempted second degree murder if it found an attempt, as defined by A.R.S. section 13–1001(A) (1989), and any of the three culpable mental states of intentionally, knowingly or recklessly required by the second degree murder statute, A.R.S. section 13–1004 (1989). The jury did convict defendant of this charge pursuant to these instructions, and the verdict forms did not require the jury to indicate which mental state it had found. These circumstances triggered our inquiry into whether this conviction may have been based on a reckless mental state and, if so, whether there is such a crime in Arizona as attempted reckless second degree murder.

In *State v. Adams,* 155 Ariz. 117, 745 P.2d 175 (App.1987), we resolved whether attempted reckless manslaughter or attempted negligent homicide were cognizable offenses under our criminal code. We determined that in order to commit an "attempt" a defendant must have an intent to perform acts *and* to achieve a result which, if accomplished, would constitute the crime. *Id.* at 120, 745 P.2d at 178. Since "reckless" by definition necessarily involves an unintended result, we concluded that there was no such

criminal offense in Arizona as attempted reckless manslaughter or attempted negligent homicide. *Id.*

■ We see no credible distinction between attempted reckless manslaughter and attempted reckless second degree murder in determining whether one can attempt to commit either crime. The added element in reckless second degree murder which raises it from reckless manslaughter is an extreme indifference to human life which creates a grave risk of death to another. *State v. Walton,* 133 Ariz. 282, 291, 650 P.2d 1264, 1273 (App.1982). This merely describes a higher quantum of recklessness, *id.,* but does not change the critical fact that the culpable mental state is still that of "reckless." In other words, for a conviction of reckless second degree murder, no intent to achieve a result need be shown. Without such a requirement, there can be no attempt to commit such a crime. We therefore hold that in Arizona there is no offense of attempted reckless second degree murder.

■ The state nevertheless argues that giving the instruction was not fundamental error because, under the facts of the case, there was virtually no possibility that the jurors convicted defendant of anything but attempted intentional or knowing homicide. We do not find that to be the case. While arguing the homicide charge, the prosecutor on two occasions referred the jurors to the "reckless" aspect of the attempted murder instruction, suggesting they could rely on that mental state for conviction. Defendant's primary defense to the homicide was alibi, but defense counsel wisely spent a great deal of his argument pointing out that whether the jury was persuaded as to the alibi defense, it still could not convict defendant without finding the state had proved every element of the charged crime. Defense counsel suggested that the jury should view the shooting as an accident. This necessarily suggested unintentional conduct which, in turn, necessarily implicated the reckless second degree murder instruction. Based on this, we conclude that the jury could well have convicted defendant of attempted reckless second degree murder. The giving of

the instruction was therefore fundamental error, *see State v. King*, 158 Ariz. 419, 424, 763 P.2d 239, 244 (1988), and defendant's conviction on this charge must be vacated.

### 3. Child Sexual Abuse Accommodation Syndrome.

Defendant moved *in limine* to preclude expert testimony by Wendy Dutton on "Child Sexual Abuse Accommodation Syndrome" ("CSAAS"), a set of behavioral characteristics common to child sexual abuse victims. Defendant conceded that Arizona courts permit expert testimony on CSAAS and stated that he did not object to Dutton "per se as an expert." He did argue, however, that her testimony would be insufficiently probative of issues in dispute. The trial court denied the motion, and Dutton testified at trial regarding generally shared characteristics of child sexual abuse victims, explaining such phenomena as secrecy, helplessness, coping mechanisms, responses to abuse, and "script memory." Dutton also described familiar patterns of disclosure by the victim to others and common techniques used by perpetrators to keep the victim from disclosing the abuse to others.

■ On appeal, defendant has abandoned his trial objection and now argues that Dutton's testimony was inadmissible hearsay, that she was insufficiently qualified to render opinion testimony on CSAAS, that CSAAS is not a proper subject for opinion testimony, that the trial court should have conducted a *Frye* hearing before permitting testimony on CSAAS, and that Dutton's testimony unfairly prejudiced defendant under Rule 403 of the Arizona Rules of Evidence. Since defendant did not make any of these objections before or during trial, they are waived absent fundamental error. *State v. Hamilton*, 177 Ariz. 403, 409, 868 P.2d 986, 992 (App.1993).

■ Defendant's hearsay argument is founded on Dutton's reliance on research by Dr. Roland Summit, the expert who developed the CSAAS criteria. Defendant claims that since Dr. Summit did not testify and was not subject to cross-examination, Dutton's testimony regarding the syndrome was hearsay. In effect, defendant would have had the trial court preclude Dutton's testimony be-cause she was not the original researcher who devised the CSAAS criteria. Such a conclusion would result in depriving courts and jurors of testimony from almost every expert witness in the country and would, upon the death of each "original," cause the loss of the benefit of that research. *See Reeves v. Markle*, 119 Ariz. 159, 162, 579 P.2d 1382, 1385 (1978) ("If expert witnesses could not rely on information gained through their study of scientific literature because of its hearsay nature, then it would be virtually impossible for any expert to evaluate the facts presented in any lawsuit, because nearly everything a person has learned technically constitutes hearsay."). There is no merit to defendant's contention that Dutton's testimony was inadmissible hearsay.

■ Defendant next argues that Dutton was not qualified to give expert testimony because she is not a licensed psychiatrist or psychologist. Defendant cites *State v. Bailey*, 166 Ariz. 116, 800 P.2d 982 (App.1990) in support of this contention. *Bailey* held that a licensed psychologist was sufficiently qualified to opine that the defendant in that case had a continuing propensity to commit sexually aberrant acts. *Id.* at 117, 800 P.2d at 983.

The holding in *Bailey* cannot be stretched to support the premise that only licensed psychologists are qualified to testify regarding CSAAS. Unlike the psychologist in *Bailey*, Dutton's testimony did not require her to analyze defendant's mental or emotional condition or that of anyone else; rather, the purpose of her testimony was to identify behavioral characteristics common to child sexual abuse victims. In support of her qualifications to so testify, Dutton recited that she had a bachelor of science degree in psychology and a master of arts degree in marriage and family counseling, that she was employed at the time of her testimony as a forensic interviewer and program coordinator of the Child Abuse Assessment Center of Saint Joseph's Hospital in Phoenix, and that she had been working in the field of sexual abuse for ten years. Her testimony enabled the trial court to properly find that Dutton was sufficiently qualified under Rule 702 of

the Arizona Rules of Evidence to testify as she did. *Bailey* does not dictate a contrary result.

■ Defendant next contends that expert testimony regarding CSAAS was inadmissible because the principles of CSAAS are within the common understanding of jurors. This argument necessarily is offered as a contrary alternative to the immediately preceding argument which asserts that only a highly qualified expert, a licensed psychologist or psychiatrist, can testify regarding CSAAS. In any event, our appellate courts have expressly rejected this argument on several occasions. *State v. Lindsey,* 149 Ariz. 472, 473–74, 720 P.2d 73, 74–75 (1986); *State v. Varela,* 178 Ariz. 319, 325, 873 P.2d 657, 663 (App.1993); *Hamilton,* 177 Ariz. at 409, 868 P.2d at 992. We rest on those decisions in rejecting the same argument here.

■ Defendant next argues that a *Frye* hearing was necessary to determine whether CSAAS is a generally accepted theory in the relevant scientific community. This, too, is a proposition previously rejected by this court. *Varela,* 178 Ariz. at 325–26, 873 P.2d at 663–64. Defendant nevertheless urges us not to follow *Varela* on the ground that *People v. Stoll,* 49 Cal.3d 1136, 265 Cal.Rptr. 111, 783 P.2d 698 (1989), upon which this court relied in *Varela,* did not involve CSAAS. We acknowledged in *Varela* that *Stoll* was not a CSAAS case, but adopted *Stoll*'s approach in the CSAAS context because, like the "profile" testimony admitted in *Stoll,* "[t]he testimony concerning general characteristics of child sexual abuse victims is not 'new, novel or experimental scientific evidence' and therefore does not require the additional

screening provided by *Frye.*" *Varela,* 178 Ariz. at 325–26, 873 P.2d at 663–64. We are satisfied that *Varela* was correctly decided.[1]

■ Defendant lastly contends that Dutton's testimony was of limited probative value and should have been excluded under Rule 403 of the Arizona Rules of Evidence because its prejudicial effect greatly outweighed such value. Defendant asserts that the presentation of this testimony was, in effect, an invitation to the jury to believe that sexual abuse occurred in this case. Our review of Dutton's testimony, however, reveals that Dutton was quite careful to point out the limitations of the CSAAS concept and clearly pointed out that the CSAAS factors alone do not indicate whether abuse occurred in a particular case.[2] We find no unfair prejudice.

### 4. Opinion Testimony by Non–Examining Physician.

■ Dr. Kaye Roth–Farley, a pediatrician and the Medical Director of the Child Abuse Treatment Center at St. Joseph's Hospital, testified as an expert witness for the state. Roth–Farley did not personally examine C but reviewed medical records, including reports prepared by Drs. Gannon and Kelley, physicians who did examine C during the relevant time period. Roth–Farley testified after the examining doctors and stated that she had performed over 850 medical examinations of children alleged to have been sexually abused. This number is significantly greater than the number of such examinations performed by Drs. Gannon or Kelly. The opinions she expressed on the case generally went beyond those expressed by Gannon, a general practitioner, and Kelly,

---

1. The *Frye* test appears to have been satisfied nonetheless. Dutton answered "yes" to the prosecutor's question whether it is "generally accepted by professionals who deal with issues of child sexual abuse that there may be some general behavioral characteristics that child victims may share?" Her affirmative response was never challenged, and she went on to describe CSAAS.

2. Dutton consistently tempered her testimony on CSAAS with words and phrases such as "generally," "tend to," "often," "oftentimes," "some," "frequently," "commonly," "likely," and "may."

On cross-examination, the following exchange occurred:

Q: Now, these factors that you were telling us about, I think you said they are not present in all cases, right?

A: That's correct.

Q: And are there some cases, child abuse cases, sexual abuse cases, in which some of the factors are present and some not?

A: That's correct.

Q: Does the presence or absence of any of these factors tell us whether or not sexual abuse occurred in a particular case?

A: No.

a pediatrician who had performed approximately twenty examinations of sexually abused children.

On appeal, defendant first argues that Roth–Farley's testimony was inadmissible because she did not personally examine C and had no basis on which to testify other than the findings of the two doctors whose testimony preceded hers. Defendant also asserts that Roth–Farley was called merely to "bolster" the testimony of the examining doctors. Defendant does not explain what he means by this latter assertion, but we assume he is arguing that Roth–Farley's testimony was merely cumulative and therefore irrelevant.

Rule 703 of the Arizona Rules of Evidence permits expert testimony based on facts or data "made known to the expert at or before the hearing." Roth–Farley based her opinion on the facts set forth in the reports authored by Gannon and Kelley. In *Gaston v. Hunter*, 121 Ariz. 33, 588 P.2d 326 (App. 1978), this court held that it was error to exclude testimony by physicians regarding the toxic effect of a drug simply because those physicians had not personally used the drug in question on their own patients. *Id.* at 44–45, 588 P.2d at 337–38. Consistent with Rule 703 and *Gaston*, we find that it was not necessary for Roth–Farley to have personally examined C prior to expressing her opinions.

■ Moreover, Roth–Farley's testimony was not merely cumulative. She had extensive experience and training beyond that of the physicians who examined C, and she offered opinions beyond those offered by Gannon and Kelley. We find no error in the admission of her testimony.

### 5. The Admission of Exhibits 15 and 16.

■ In connection with the attempted homicide charge, the state introduced into evidence a live .25 caliber cartridge recovered from the crime scene and the bullet that Francine removed from her breast. Defendant argues that the court erred in admitting these exhibits because there was inadequate foundation. Although we have reversed the

conviction on this charge, we address this issue because it may occur on retrial.

Officer Ignacio Ygana testified that he was present when the shell casings were recovered at the scene where Francine was shot. Francine testified that several weeks after the shooting she personally removed a bullet from her own breast and Officer Ygana testified that Francine gave him a bullet. However, the prosecutor did not use Ygana or Francine as a testimonial sponsor for either of these exhibits. Instead, the prosecutor asked the principal investigator, Detective Nixon, whether he knew how each of these exhibits "relate[d] to this case." Nixon responded that he could make that determination based on the police receipt and envelope containing the exhibit. As to exhibit 15, he recited, based on the information on the receipt, that the bullet came "from the victim." Essentially the same procedure was followed with respect to the admission of exhibit 16. Over foundation and hearsay objections, the trial court admitted both exhibits.

The admission of these exhibits was error. Nixon testified that he was not the officer who impounded the exhibits, he did not fill out the receipts or place them on the envelopes, and he was not the custodian of records for the exhibits. His testimony that the bullet marked as exhibit 15 came from Francine and the cartridge marked as exhibit 16 came from the crime scene was based on nothing more than the police department receipts attached to the evidence envelopes. However, the receipts were hearsay and Nixon's recitation of their content did not bring them within any hearsay exception. *See State v. Walker*, 181 Ariz. 475, 482, 891 P.2d 942, 949 (App.1995) (prosecutor's avowal that fingerprint card was a business record of police department was insufficient to support admission of document as a public record or business record). On retrial, these exhibits may not be admitted unless a proper foundation is laid.

### 6. Amendment of the Indictment.

The indictment in CR 92–09803 charged defendant with attempting to kill Francine "by shooting her with a gun." At the close of the state's case, defendant moved for a di-

rected verdict on the ground that the state had shown that defendant hit Francine with a gun, but had not shown that defendant shot Francine as the indictment alleged. The state argued that the evidence was sufficient to convict defendant under the indictment as filed, but moved to amend the indictment to conform to the evidence to charge defendant with attempted homicide by either shooting or hitting Francine with the gun. The trial court granted the amendment.

 Our reversal of defendant's conviction on this charge renders defendant's assignment of error moot. We note, however, that the motion to amend was properly granted. The propriety of the amendment turned upon whether it violated two important rights of the defendant: (1) an amendment must not prejudice the defendant by depriving him of notice of the charges and the ability to defend against them, and (2) an acquittal of the amended charge must provide a double jeopardy defense to a subsequent prosecution on the original charge. *State v. Phelps,* 125 Ariz. 114, 119, 608 P.2d 51, 56 (App.1980); *see also State v. Sowards,* 147 Ariz. 185, 189, 709 P.2d 542, 546 (App. 1984); *State v. Barber,* 133 Ariz. 572, 577, 653 P.2d 29, 34 (App.1982). The amendment in this case did not violate either right. Therefore, on retrial, the charge against defendant may proceed on the theory that defendant attempted to kill Francine by shooting her with the gun, by hitting her with the gun, or both.

## 7. Judicial Bias and Prosecutorial Misconduct.

 Defendant contends that bias on the part of the court and misconduct on the part of the prosecutor deprived him of a fair trial. Regarding the former, defense counsel moved for recusal during trial, and the court instructed him to file a written motion for change of judge for cause. The trial judge's instruction was correct since a party moving for change of a judge for cause must support the motion with an affidavit setting forth specific grounds. Ariz. R.Crim. P. 10.1(b); *State v. Carver,* 160 Ariz. 167, 172, 771 P.2d 1382, 1387 (1989) (placing one's perceptions and concerns on the record does not satisfy the specificity requirement of Rule 10.1(b)). However, defense counsel failed to file any written motion or affidavit and has therefore waived this issue absent fundamental error.

 Our review of the record shows no support for defendant's claim of judicial bias. At best, defendant can show only that some antagonism existed between his counsel and the trial judge. This is insufficient to support a recusal motion.

> "[C]ourts have drawn a sharp distinction between alleged hostility between judge and party and alleged hostility between judge and attorney." Recusal based on the alleged appearance of hostility between an attorney and judge, or bias by a judge against an attorney, is not warranted except in extreme or rare instances.

*United States v. Ahmed,* 788 F.Supp. 196, 202 (S.D.N.Y.) (citations omitted), *aff'd,* 980 F.2d 161 (2d Cir.1992); *see also In re Drexel Burnham Lambert, Inc.,* 861 F.2d 1307, 1316 (2d Cir.1988), (disqualification of judge must be determined "on the basis of conduct which shows bias or prejudice or a lack of impartiality by focusing on a party, not on counsel"), *cert. denied, Milken v. S.E.C.,* 490 U.S. 1102, 109 S.Ct. 2458, 104 L.Ed.2d 1012 (1989).

 Defendant also cites many specific adverse rulings by the trial court during the course of the trial. Disagreements over rulings are insufficient to support recusal. *See In re Ronwin,* 139 Ariz. 576, 586, 680 P.2d 107, 117 (1983) (recusal not required even where party has filed collateral lawsuit against the judge over a ruling), *cert. denied,* 464 U.S. 977, 104 S.Ct. 413, 78 L.Ed.2d 351 (1983). Defendant does not argue reversible error with respect to any particular adverse ruling he cites, but seems to believe that the cumulative effect of these rulings shows that the trial judge was unfairly biased. This court does not subscribe to the doctrine of cumulative error. *State v. Prince,* 160 Ariz. 268, 274, 772 P.2d 1121, 1127 (1989). Moreover, we fail to understand how adverse rulings to which a party assigns no error can nevertheless amount to bias on the part of the judge. We find no error arising from the trial judge's refusal to recuse himself.

■ Regarding the allegation of prosecutorial misconduct, defendant fails to identify any such misconduct that would support his claim that he was deprived of a fair trial. Defendant complains with some justification that the prosecutor's questions to defense witness Delaia Young approached the level of testimony. However, the prosecutor was responding to Young's direct testimony that C did not behave like a child who had been molested. The questions reflect the prosecutor's attempt to deal with Young's improper opinion testimony which had been elicited, over repeated objection, on direct examination. The only foundation for Young's direct testimony was that Young herself was molested as a child and had watched Christian television programs on the subject. The trial court's admission of Young's opinion testimony on direct illustrates the court's liberal approach in permitting defendant to present his defense. The court's decision to permit the prosecutor's broad cross-examination reflects even-handedness, not bias, and the prosecutor's questions did not amount to misconduct.

■ Defendant's complaints regarding the state's compliance with the rules of discovery are equally unavailing on appeal. We note with dismay that purported discovery violations led to several motions and hearings at the behest of both parties below. However, we find nothing that rises to the level of prosecutorial misconduct which affected defendant's ability to present a defense to the jury.

## 8. Aggravating Sentencing Factors.

Defendant contends that the trial court erred by considering two inappropriate factors in aggravating his sentences. The trial court took into consideration that defendant beat C for the purpose of making her perform oral sex on him and that defendant's sexual misconduct spanned some five years. Defendant challenges the first factor because C recounted a coercive beating only with respect to the oral sex alleged in Count V of the indictment and defendant was acquitted on that count. Defendant challenges the second factor on the ground that he was convicted of crimes spanning only some one and

one-half years. Defendant failed to raise these objections before or during sentencing, so we review only for fundamental error. *State v. Atwood,* 171 Ariz. 576, 629, 832 P.2d 593, 646 (1992), *cert. denied,* 506 U.S. 1084, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993).

■ The state contends that the trial court's consideration of the first factor was lawful under *State v. Andersen,* 177 Ariz. 381, 868 P.2d 964 (App.1993), *cert. denied,* 512 U.S. 1224, 114 S.Ct. 2717, 129 L.Ed.2d 842 (1994). In *Andersen,* the defendant was convicted of negligent homicide for shooting one victim, but acquitted of aggravated assault based on an allegation that he pointed a loaded weapon at the victim's companion. This court upheld the sentence on the homicide conviction, which had been aggravated in part on a finding that defendant pointed a loaded gun at the companion. We held the trial court's finding "was amply supported in the record" and reflected appropriate sentencing considerations. *Id.* at 385, 868 P.2d at 968; *accord State v. Kelly,* 122 Ariz. 495, 498–99, 595 P.2d 1040, 1043–44 (App.1979) (trial court's broad sentencing discretion to consider all relevant information "extends even so far as to allow consideration of evidence of crimes for which the defendant has been charged, tried and acquitted").

Moreover, we note that defendant was not charged with beating C in connection with Count V, only with having sex with a minor. Thus, whether the defendant beat C was not even an issue before the jury on this count. Consequently, the trial court's finding is not factually inconsistent with the jury's acquittal on Count V. There was adequate evidence to support the finding that defendant beat C, and we conclude that the trial judge committed no error in aggravating defendant's sentence on this basis.

■ As to the second factor, the presentence investigation report supports the trial court's finding that defendant's misconduct occurred over a prolonged period. The probation officer who prepared the report quoted two sources who concluded that defendant had abused C for six or seven years. C's trial testimony established that she had been molested over at least a three year period.

As noted above, the trial court is not circumscribed in its consideration of evidence at sentencing by the verdicts of the jury. This evidence was properly considered by the trial judge and clearly supported his finding that defendant's sexual misconduct spanned some five years.

## CONCLUSION

We find no error with respect to defendant's convictions and sentences for the two counts of sexual conduct with a minor and sexual abuse. We therefore affirm those convictions and sentences. We do find error with respect to defendant's conviction for attempted second degree murder and therefore vacate that conviction and the sentence imposed thereon. We remand this matter to the trial court for a new trial on the charge of attempted second degree murder.

FIDEL, P.J., and LANKFORD, J., concur.