934 P.2d 784

**STATE of Arizona, Appellee,**

v.

**Eric Owen MANN, Appellant.**

No. CR–95–0077–AP.

Supreme Court of Arizona,
En Banc.

March 11, 1997.

Grant Woods, Arizona Attorney General by Paul J. McMurdie, Randall M. Howe, Phoenix, for State of Arizona.

Isabel G. Garcia de Romo, Tucson Pima County Legal Defender by Lois Yankowski, Alex D. Heveri, Tucson, for Eric Owen Mann.

## OPINION

FELDMAN, Justice.

Defendant Eric Owen Mann was convicted of first degree murder and sentenced to death for the killings of Richard Alberts and Ramon Bazurto during a drug deal. Appeal to this court is automatic on capital counts and we have jurisdiction pursuant to A.R.S. § 13–4031 and Ariz.R.Crim.P. 31.2(b). We affirm the judgment.

### FACTS AND PROCEDURAL HISTORY

Defendant and his girlfriend, Karen Miller, rented a house in Tucson where they sold cocaine, marijuana, and guns. Typically,

Karen sold "eight-balls" (one-eighth of an ounce packets) of cocaine in the evening while Defendant worked on bigger drug deals.

In late November 1989, Defendant told Karen of his plan to rip off Richard Alberts, a friend also involved in the cocaine trade. Defendant set up a deal to sell about a kilogram of cocaine for roughly $20,000. According to Karen, Defendant knew he would have to "whack" (kill) Alberts after taking the money and giving Alberts a shoebox filled with newspaper instead of cocaine.

The plan changed when Alberts showed up with another man, Ramon Bazurto. Defendant, however, quickly made up his mind "to do it." The men entered the house and followed Defendant back to the master bedroom. Karen followed behind and stood in the doorway, between Alberts and Bazurto. After trading the bag of money for the shoebox, Alberts lifted the top of the box that contained only newspaper. Almost instantaneously, Defendant shot Alberts and then Bazurto. Each was shot once, Alberts through the heart and Bazurto through the lung, severing the aorta. Both bullets passed through the bodies and traveled through the walls of the house.

Alberts died almost instantly but Bazurto did not. According to Karen, he feebly attempted to reach for the gun he was carrying in his waistband. Defendant placed his foot on Bazurto's hand to stop him and described to Karen what was happening as the victim lost motor control and died. She testified it took from three to five minutes for Bazurto to die.

Defendant got a friend, Carlos Alejandro, to help him dump the bodies near a rural road in the vicinity of Fort Grant prison, near Safford. The next day, Defendant and Karen did a thorough cleaning job to erase all traces of the murder. All the walls and floors were scrubbed and patched, and the room was repainted. Defendant gave Alberts' car to an acquaintance to whom he owed money. He also dismantled his guns, destroyed the mechanisms with a hammer, and scattered the pieces, as well as the recovered bullets, in a lake. When questioned by police, Defendant told them Alberts and

Bazurto had come to the house but left after the drug deal failed.

Nothing more came of the case until January 1994 when Karen Miller ended her relationship with Defendant, allegedly because of escalating domestic violence and his threats to "do it again." After moving, she told the police about the murder. Police tracked down Alejandro and the person to whom the car had been given and were able to corroborate Karen's story. Defendant then was arrested and charged with the murders of Alberts and Bazurto. Karen Miller and Alejandro were never charged for their part in the murders or cover-up.

At trial, Defendant was found guilty of the murders, based primarily on the testimony of Karen Miller and Carlos Alejandro. At sentencing, the trial judge found three aggravating factors: pecuniary gain (§ 13–703(F)(2)); multiple murders (§ 13–703(F)(8)); and, in the case of Bazurto, cruelty and depravity (§ 13–703(F)(6)). The judge found the statutory and non-statutory mitigators were insufficient when weighed against the aggravators and sentenced Defendant to death for both murders.

## DISCUSSION

### A. Trial issues

#### 1. The stipulation

■ Defendant claims the trial judge committed fundamental error by admitting an inculpatory statement without determining whether the waiver of Defendant's Fifth Amendment rights was knowing, intelligent, and voluntary. The stipulation read: "Defendant was familiar with the area where the victim's [sic] bodies were found and had been in that area at the time the bodies were left there." This stipulation was made to preclude the prosecution from submitting evidence that Defendant was familiar with the area because he had been previously incarcerated at Fort Grant.

The judge told the jury, however, that it "is stipulated between the prosecution and defense that the defendant, Eric Mann, was familiar with the area along Arizona route 666 **when** the bodies of Richard Alberts and

Ramon Bazurto Junior were found." Reporter's Transcript (R.T.), Oct. 28, 1994, at 5 (emphasis added).

After the stipulation was read, the prosecutor interjected that the stipulation should have read "**where** [not when] the bodies ... were found," and the judge reread it to the jury. After the lunch break the prosecutor again told the judge a mistake had been made, stating the stipulation should have read that Defendant had been in the area "prior to" not "on" the date the bodies were left. The exchange was:

THE COURT: Well, do you want me to read it to them again?

DEFENSE: It's your call.

PROSECUTOR: It's your call. You want to leave it alone?

DEFENSE: I'll leave it alone. I wasn't going to say in closing he wasn't there, he wasn't familiar with the area.

*Id.* at 55.

■ In *United States v. Miller*, 588 F.2d 1256 (9th Cir.1979), the court held that when a stipulation amounts to a guilty plea, Rule 11 procedures must be followed. *Id.* at 1263; Fed.R.Crim.P. 11. But where stipulations are not tantamount to a guilty plea, the trial court need only assure that the stipulation was made voluntarily. *Id.* In *State v. West,* this court stated a defendant may be bound by trial counsel's strategic decisions to waive rights. Only when the circumstances are exceptional must a defendant consent to the waiver. 176 Ariz. 432, 447, 862 P.2d 192, 207 (1993). Here, defense counsel clearly made a tactical decision to stipulate and avoid revealing the prior incarceration. Furthermore, he decided not to have the stipulation corrected, presumably to avoid emphasizing it to the jury. The tactical decisions had merit and were reasonable. In *West,* this court stated, "We do not believe a stipulation to facts that the state could easily have proved amounts to an exceptional circumstance." *Id.* That principle is appropriately applied to the present case, in which Defendant claimed self-defense and did not deny killing the victims and disposing of their bodies. We see no error.

## 2. Correction of witness testimony

■ Defendant claims there was reversible error because Karen Miller testified she had not been granted immunity when she had and the prosecutor did not correct her testimony. Defendant's counsel questioned Karen Miller, asking:

DEFENSE: And is it your understanding that you're not going to be charged with any crime in this case?

KAREN MILLER: I don't have any understanding on that at all. I don't know.

DEFENSE: Are you hopeful that you will not be charged with any crime based on this case?

MILLER: Yes, I am.

DEFENSE: And you're hoping that your testimony here today will lead to that result; isn't that right?

MILLER: Yes, I am.

R.T., Oct. 26, 1994, at 115–16. Defendant argues that the prosecutor committed misconduct by failing to bring out that the State had made a deal with Karen.

But the prosecutor did not hide the deal or Karen's bias from the jurors. During argument the prosecutor told the jurors, "[s]he's been granted or told she will not be prosecuted on this case simply because without that promise, we would not have the person who had pulled the trigger." R.T., Oct. 25, 1994, at 143. This point was driven home as well by Defendant in his opening statement and closing argument. Counsel stated that these were "self-serving statements of two people, Karen Miller and Carlos Alejandro, who both have gotten complete immunity." R.T., Nov. 1, 1994, at 30. We do not believe that Miller's arguably false testimony "in reasonable likelihood [could] have affected the judgment of the jury...." *Napue v. Illinois,* 360 U.S. 264, 271, 79 S.Ct. 1173, 1178, 3 L.Ed.2d 1217 (1959) (where witness answered a question falsely, the prosecutor knew of the falsehood and did not correct it); *see also Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972) (the lie must be material and affect the verdict).

# 226

## B. Sentencing issues and independent review of aggravators and mitigators

■ This court independently reviews death sentences for error, determines whether the aggravating circumstances have been proved beyond a reasonable doubt, considers any mitigating circumstances, and then weighs the aggravating and mitigating circumstances in deciding whether the mitigating circumstances are substantial and warrant leniency. *State v. Brewer,* 170 Ariz. 486, 500, 826 P.2d 783, 797, *cert. denied,* 506 U.S. 872, 113 S.Ct. 206, 121 L.Ed.2d 147 (1992).

### 1. Aggravating factors

A defendant is eligible for the death penalty when the state has proven beyond a reasonable doubt the existence of at least one statutory aggravating circumstance. A.R.S. § 13–703(E) (amended 1993). In this case, the judge found three aggravating circumstances: pecuniary gain (§ 13–703(F)(5)), cruelty in the murder of Ramon Bazurto (§ 13–703(F)(6)), and multiple homicides (§ 13–703(F)(8)). Defendant contests the first two findings.

#### a. Heinous, cruel, or depraved

■ A.R.S. § 13–703(F)(6) is disjunctive, and a finding of either cruelty or heinous/depraved conduct is sufficient to find this aggravating factor. *State v. Roscoe,* 184 Ariz. 484, 500, 910 P.2d 635, 651 (1996). The judge found the (F)(6) factor applicable to the murder of Ramon Bazurto, and we believe the circumstances support a finding of cruelty.

■ To show a murder was especially cruel, the state must prove beyond a reasonable doubt that the victim consciously suffered physical or emotional pain. *State v. Bible,* 175 Ariz. 549, 604, 858 P.2d 1152, 1207 (1993), *cert. denied,* 511 U.S. 1046, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994). Defendant argues that the medical examiner testified that Bazurto probably was conscious only for ten to twenty seconds and during that time may have been in a state of shock. But Karen Miller testified that Bazurto was alive for three to five minutes. The judge found Karen Miller's testimony more persuasive. Conflicts in the evidence are for the trial judge to resolve. *State v. Milke,* 177 Ariz. 118, 128, 865 P.2d 779, 789 (1993), *cert. denied,* 512 U.S. 1227, 114 S.Ct. 2726, 129 L.Ed.2d 849 (1994). The judge explained he believed Karen's compelling testimony and discounted the pathologist's testimony because the medical examiner was uncertain whether Bazurto would have suffered.

Given Karen's testimony and the judge's findings, the evidence was sufficient to find the murder was cruel because Bazurto was alive and conscious for an appreciable period of time. *See State v. Herrera,* 176 Ariz. 21, 34, 859 P.2d 131, 144, *cert. denied,* 510 U.S. 951, 114 S.Ct. 398, 126 L.Ed.2d 346 (1993) (a period between eighteen seconds and several minutes was sufficient). Moreover, Defendant did not contend Karen's observations that Bazurto was conscious and attempted to defend himself were scientifically or medically impossible, nor did Defendant provide any evidence to that effect.

#### b. The application of (F)(6) is not unconstitutionally vague

■ Defendant argues the sole definition of the conduct required to satisfy the (F)(6) factor was stated in *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). Because the judge did not base his findings and special verdict specifically on the language of *Walton,* Defendant argues the application of the (F)(6) factor was unconstitutionally vague. We disagree.

Findings of cruelty, heinousness and depravity as aggravating factors warranting the death penalty are usually based on the definitions used in *State v. Gretzler* (the *Gretzler* factors). 135 Ariz. 42, 659 P.2d 1, *cert. denied,* 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). Defendant posits that the Ninth Circuit held the *Gretzler* factors were too vague in *Adamson v. Ricketts,* 865 F.2d 1011 (9th Cir.1988). Furthermore, Defendant argues the *Gretzler* definitions were not completely approved when the Supreme Court considered the application of Arizona's aggravating factors in *Walton.*

*Adamson* was not specifically overruled in *Walton,* although in denying certiorari on this issue in a later case, three justices would have remanded Adamson's case to the Ninth

Circuit to reconsider in light of *Walton. Lewis v. Adamson,* 497 U.S. 1031, 110 S.Ct. 3287, 111 L.Ed.2d 795 (1990). In *Walton,* the Supreme Court examined Arizona's aggravating factors to determine if this court's definitions provided sufficient guidance to the sentencer. The Court held that our definition of the (F)(6) factor passed constitutional muster. *Walton,* 497 U.S. at 654, 110 S.Ct. at 3057. Defendant argues the specific definitions used by the Court in *Walton,* and not the articulation in *Gretzler,* are the only definitions that are constitutionally allowable.

But in *Lewis v. Jeffers,* the United States Supreme Court stated:

*Walton* therefore squarely forecloses any argument that Arizona's subsection (F)(6) aggravating circumstance, as [previously] construed by the Arizona Supreme Court [in *Gretzler* ], fails to channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.'

497 U.S. 764, 777–78, 110 S.Ct. 3092, 3100–01, 111 L.Ed.2d 606 (1990) (citations omitted); *see also State v. Mata,* 185 Ariz. 319, 339, 916 P.2d 1035, 1055 (1996) (Zlaket, V.C.J., dissenting).

### c. The murder of Ramon Bazurto was for pecuniary gain

■ Defendant argues the trial judge erred in finding pecuniary gain under § 13–703(F)(5) because Bazurto appeared unexpectedly and Defendant had not previously contemplated killing him. Because the murder of Bazurto was not part of the rip-off plan, Defendant argues the judge erroneously found the pecuniary gain aggravating factor.

■ This circumstance exists when pecuniary gain is a motive or cause for the murder. *State v. Spears,* 184 Ariz. 277, 292, 908 P.2d 1062, 1077 (1996); *State v. Murray,* 184 Ariz. 9, 36, 906 P.2d 542, 569 (1995); *State v. Runningeagle,* 176 Ariz. 59, 65, 859 P.2d 169, 175, *cert. denied,* 510 U.S. 1015, 114 S.Ct. 609, 126 L.Ed.2d 574 (1993). Murdering a person to facilitate a robbery and escape constitutes murdering for pecuniary

gain. *State v. Gonzales,* 181 Ariz. 502, 513, 892 P.2d 838, 849 (1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 720, 133 L.Ed.2d 673 (1996); *Runningeagle,* 176 Ariz. at 65, 859 P.2d at 175; *State v. Williams,* 166 Ariz. 132, 140, 800 P.2d 1240, 1248 (1987). Defendant planned to and did murder Alberts to steal $20,000. R.T., Oct. 26, 1994, at 22, 23–24. When Bazurto unexpectedly showed up at the house, Defendant made a choice after a period of thought and said, "Well, I got to do it," apparently meaning that to go through with the plan he would also have to murder Bazurto. R.T., Oct. 26, 1994, at 38. Even if killing Bazurto was not part of the original plan, stealing the money was the "motive, cause, or impetus," for the murders of both Alberts and Bazurto. The pecuniary gain aggravator therefore applies in this case. *See Spears,* 184 Ariz. at 292, 908 P.2d at 1077.

### d. Consideration of (F)(6) and (F)(8) factors is not double punishment

■ In the weighing process the trial court considered both multiple homicide, A.R.S. § 13–703(F)(8), and that the murders had been committed in an especially heinous, cruel, or depraved manner, § 13–703(F)(6). Defendant argues that these

circumstances constitute elements of the offense. In formulating the sentencing statute for first degree murder, the legislature must have well understood that the loss of human life was involved. Therefore, the trial court should not have considered [both] the manner of death or number of deaths as factors for aggravating the defendant's sentence.

We reject this argument. Because these circumstances—cruelty and multiple homicide—are not elements of first-degree murder (a crime that can be committed in a number of different ways), neither the United States Constitution nor A.R.S. § 13–116 is violated. No double punishment problem exists. *See Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988); *State v. Lara,* 171 Ariz. 282, 285, 830 P.2d 803, 806 (1992).

### 2. Victim impact evidence

■ The United States Supreme Court has held that a "State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant ... as to whether or not the death penalty should be imposed." *Payne v. Tennessee,* 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991) (overruling in part *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987)). Arizona has made that choice and thus, under the Arizona Constitution, and to the extent allowed by *Payne* and our cases, victim impact evidence should be considered by the court to rebut the defendant's mitigation evidence. Ariz. Const. art. II, § 2.1(A); *State v. Bolton,* 182 Ariz. 290, 315, 896 P.2d 830, 855 (1995); *see also State ex rel. Romley v. Superior Court,* 172 Ariz. 232, 836 P.2d 445 (App.1992) (Ariz. Const. art. II, § 2.1 limited by rights granted by federal constitution).

#### a. Consideration of recommendations of victims' families

■ Defendant asserts that the trial judge was barraged with letters from the victims' immediate family members that explicitly requested the death penalty be imposed. Furthermore, he claims, the judge solicited, considered, and gave weight to the survivors' recommendations in determining the sentence.

We have held that such recommendation do not tend to establish an aggravating circumstance and are therefore irrelevant for that *purpose. Spears,* 184 Ariz. at 292, 908 P.2d at 1077; *Roscoe,* 184 Ariz. at 502, 910 P.2d at 653; *State v. Gulbrandson,* 184 Ariz. 46, 66, 906 P.2d 579, 599 (1995). The record in the present case, however, does not indicate that the judge gave weight to family opinions. In fact, he stated that the finding of aggravating circumstances was based solely on the evidence adduced at trial. In commenting about the families' opinions, furthermore, the judge merely stated that he understood their feelings. We see nothing in this record or the circumstances surrounding this trial from which to assume that the judge was improperly influenced by family recommendations.

In similar circumstances, we have stated: We acknowledge that family testimony concerning the appropriate sentence may violate the Constitution if presented to a capital sentencing jury.... We also acknowledge that victim impact testimony is not relevant to any of our statutory aggravating factors.

We nonetheless find no reversible error. Defendant ... was sentenced by a judge, and the judge expressly stated on the record that he would consider the parents' statements only in connection with the non-capital counts. Absent evidence to the contrary, we have assumed that the trial judge in a capital case is capable of focusing on the relevant sentencing factor and setting aside the irrelevant, inflammatory and emotional factors.... Given this assumption and the trial judge's express avowal, we find no error.

*Bolton,* 182 Ariz. at 315–16, 896 P.2d at 855–56 (citations omitted); *see also Roscoe,* 184 Ariz. at 502, 910 P.2d at 653.

#### b. Improper ex parte communications

■ Defendant claims the manner in which victim impact evidence was directed to the trial judge was an improper ex parte communication that created error in the sentencing procedure. Both the victims' immediate and extended family and friends sent letters directly to the judge. We do not find error simply because letters were sent to the judge by persons not specifically defined in the Arizona Constitution as victims with the right to be heard at sentencing. *See* Ariz. Const. art. II, § 2.1 (defining "victim"). We have no way of preventing members of the community from writing judges. Approximately thirty-five letters were sent to the judge. In accordance with normal procedure, he gave them to the clerk's office for filing. Copies of the letters were also attached to the presentence report, a copy of which was given to Defendant. *See* Ariz. R.Crim.P. 26.6.

■ As previously noted, we presume the trial judge will ignore irrelevant information. This is particularly true when the judge stat-

ed at sentencing he found the aggravating factors "solely on the evidence adduced at trial," and when the record clearly establishes beyond a reasonable doubt the three aggravators found by the judge.

Defendant points out that the judge made personal remarks about the impact evidence, but in context the remarks were merely expressions of empathy, not evidence of prejudice. Furthermore, the judge's comments were meant to clarify the statement by the victim's mother's, which could be interpreted as requesting life imprisonment rather than the death penalty. Sentencing took place before our opinion in *State v. Williams*, 183 Ariz. 368, 904 P.2d 437 (1995), when the judge might have believed that a request for leniency was relevant.

### 3. Insufficient materials for appellate review

■ Defendant claims the sentencing materials were not complete because they were not paginated or indexed, there was no certification as to their completeness, and the record of the prior presentence report was not included, thus violating the stringent constitutional requirements that attach to death penalty proceedings. He asserts that the absence of an adequate record requires remand for a new sentencing hearing. *Dobbs v. Zant*, 506 U.S. 357, 113 S.Ct. 835, 122 L.Ed.2d 103 (1993); *Wilson v. Allgood*, 391 F.2d 285 (5th Cir.1968); *State v. Schackart*, 175 Ariz. 494, 858 P.2d 639 (1993), *cert. denied*, 511 U.S. 1046, 114 S.Ct. 1578, 128 L.Ed.2d 220 (1994).

■ We find the record is sufficiently complete for this court to review on appeal. *See Schackart*, 175 Ariz. at 499, 858 P.2d at 644. The court does not require a perfect record, and when materials have been omitted, the defendant may move to have the record on appeal expanded. In the present case, remanding for resentencing is no remedy for the problem because the alleged error did not occur in the trial court.

### 4. Use of psychological evaluation

■ Statements were obtained during an in-custody, court-ordered psychiatric evalua-

tion that Defendant claims was not accompanied by a full waiver of his Fifth Amendment rights. *See Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). However, Defendant is precluded from objecting to admission of the psychological evaluation at sentencing because he failed to object at the time the evaluations were admitted or conducted. *State v. Tison*, 129 Ariz. 526, 535, 633 P.2d 335, 344 (1981), *cert. denied*, 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d 147 (1982); *State v. Anaya*, 170 Ariz. 436, 443, 825 P.2d 961, 968 (App.1991).

■ Furthermore, the facts of *Estelle* vary greatly from those before us. Here, Defendant's attorney requested the post-trial evaluation for sentencing purposes, Defendant told the psychologist he could not talk about the murders, and Defendant used significant portions of the interview for his mitigation argument. Therefore, Defendant opened the door to use of the full report. . *See* Ariz.R.Evid. 106; *Buchanan v. Kentucky*, 483 U.S. 402, 422–23, 107 S.Ct. 2906, 2917–18, 97 L.Ed.2d 336 (1987).

### 5. Hearing on motion for reconsideration

After sentencing, the judge heard argument on motions for clarification of sentence and reconsideration of the (F)(6) finding. Defendant was not present at the argument. The judge denied the motion for reconsideration and, in response to issues raised in the motion, commented on the (F)(6) factor and imposition of the death penalty. Defendant now claims there was no authority to conduct the post-sentencing proceeding, *State v. Pike*, 133 Ariz. 178, 650 P.2d 480 (App.1982). In addition, he contends his absence violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution and article II, § 24 of the Arizona Constitution to be present at all stages of the proceedings. *Diaz v. United States*, 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500 (1912); *Rice v. Wood*, 44 F.3d 1396 (9th Cir.1995), *modified*, 77 F.3d 1138 (1996); *Hays v. Arave*, 977 F.2d 475 (9th Cir.1992) (not harmless error); *State v. Amaya–Ruiz*, 166 Ariz. 152, 175, 800 P.2d 1260, 1283 (1990).

Having made the motion for reconsideration, Defendant cannot complain that the judge erred by hearing that motion. *See State v. Diaz,* 168 Ariz. 363, 365, 813 P.2d 728, 730 (1991). Moreover, courts have the inherent authority to clarify or modify their own judgments and orders. *Skinner v. Superior Court,* 106 Ariz. 287, 288, 475 P.2d 271, 272 (1970); *State v. Freeman,* 174 Ariz. 303, 305, 848 P.2d 882, 884 (App.1993). Because the judge made no additional findings but merely explained the reasons for a few of his previous findings, the hearing was not part of the sentencing and was not a critical stage of the proceedings in Defendant's case.

*Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), and *Hays* held a defendant's absence from the sentencing hearing was structural error because the defendant could not communicate with the attorney about testimony given there. Such errors are not harmless because one cannot know what a defendant might have said in that situation. The *Fulminante* and *Hays* rationales do not apply here because the hearing was not an evidentiary type proceeding where Defendant could respond to witnesses. Nor was it a hearing to determine or impose sentence. The purpose was to hear counsel's argument for clarification of the judge's reasoning on a sentence already imposed. If there was error, it was not structural and was obviously harmless.

### 6. Mitigation

#### a. Disparity in sentencing of accomplices

Karen Miller was an active participant in the drug rip-off scheme and murders. Reporting the crime four years after it occurred, she was granted immunity and never charged with any offense in connection with the case. Disparity in the sentences given a defendant and an accomplice can be a mitigating factor in deciding whether a death sentence is appropriate. *See State v. Marlow,* 163 Ariz. 65, 786 P.2d 395 (1989). When it is considered, disparity is mitigating only when it is unexplained. *State v. Stokley,* 182 Ariz. 505, 523, 898 P.2d 454, 472 (1995); *State v. Schurz,* 176 Ariz. 46, 57, 859 P.2d 156, 167 (1993). The disparity here is primarily explained by the difference in culpability—Defendant was the instigator of the crime and the killer—and also because the state granted Miller and Alejandro immunity from prosecution to obtain testimony necessary to any prosecution for the killings. *State v. Apelt,* 176 Ariz. 349, 368, 861 P.2d 634, 653 (1993), *cert. denied,* 513 U.S. 834, 115 S.Ct. 113, 130 L.Ed.2d 59 (1994).

#### b. Rejection of mitigation for remorse

At sentencing the trial judge referred to a fatal traffic accident in which Defendant was involved and said that Defendant indicated no remorse. The judge's statement concerning the car accident indicates the he found that incident probative of Defendant's character and in rebuttal to mitigation evidence. Defendant invited the judge to consider the accident by mentioning it in the autobiography he prepared to show mitigation. Defendant cannot complain about the judge considering the evidence that he offered.

#### c. Non-violent history, cooperation with authorities

Defendant claims his conviction for possession of a weapon by a convicted felon and an arrest for aggravated assault were insufficient to rebut the mitigating factor of a non-violent history. Furthermore, he argues, the judge did not weigh the fact that Defendant did not flee, thus showing cooperation with authorities.

Defendant's actions belie his claim of non-violent criminal history. Considering the turn Defendant's life took with major participation in drug dealing, his allegedly peaceable life carried little weight. Moreover, considering that Defendant obstructed the criminal investigation from the time of the crime in 1989 to the time of his arrest four years later, Defendant's claim of cooperation approaches frivolity.

#### d. Review of non-statutory mitigators

Defendant asserted several non-statutory mitigators. These include:

1. His relationship with his children and the effect on them if he were executed. He says he loves them and has always attempted to be a good father. His eldest daughter testified at the sentencing as to his good character as a parent, and his youngest sent a letter to the judge about their relationship.

2. The possibility of consecutive life sentences rather than the death penalty.

3. Defendant submitted evidence that his father was an alcoholic who beat his mother and half-brother, although he never abused Defendant. Also, he says, his father was well-connected with "mafioso" types in Tucson and from an early age arranged a type of apprenticeship in thuggery for Defendant. This influence directly contributed to Defendant's behavior because he lacked "healthy socialization experiences." Psychological Evaluation, at 9.

4. Defendant states that after the murders he changed his life-style, quit using drugs and alcohol, held a steady job, and was repairing his relationship with his oldest daughter.

 The trial judge found these mitigators insufficient to call for leniency when weighed against the three aggravating factors. The possibility of a life sentence is not a mitigating factor but only a sentencing option. *Murray*, 184 Ariz. at 39, 906 P.2d at 572. An abusive family background is usually given significant weight as a mitigating factor only when the abuse affected the defendant's behavior at the time of the crime. *Id.* at 40, 906 P.2d at 573; *West*, 176 Ariz. at 451–52, 862 P.2d at 211–12; *State v. Wallace*, 160 Ariz. 424, 427, 773 P.2d 983, 986 (1989), *cert. denied*, 494 U.S. 1047, 110 S.Ct. 1513, 108 L.Ed.2d 649 (1990). Defendant did not show any connection. On independent review, we do not believe Defendant established mitigation of sufficient weight to call for leniency.

## CONCLUSION

 We find no prejudicial error in the trial or sentencing rulings. We have not conducted a fundamental error review, nor will we in future cases. This decision rests in great part on the repeal of A.R.S. § 13–4035 (which required review for fundamental error), but also on the realization that fundamental error review has outlived its necessity. We are aware the repeal of § 13–4035 does not preclude us from engaging in such a review where necessary to serve the ends of justice. Ariz. Const. art. VI, § 5(5). As well, we do not consider here waiver analysis pertaining to arguments raised for the first time on appeal.

We believe, however, fundamental error review is no longer necessary under modern circumstances. The practice arose in the days of the territorial government, when most defendants did not have a lawyer, nor were lawyers required or always appointed by the courts. *See* Ariz.Pen.Code 1901, § 1059; *see also* Ariz.Pen.Code 1901, §§ 1024 and 1025. Thus, appeals and such post-conviction relief as was available were options out of reach for most defendants. When a case was appealed, therefore, fundamental error review served a vital role in protecting the defendant's constitutional rights. Today, almost all of our counties have a public defender. In addition, we now have a panoply of mandatory protections—appointment of counsel for trial and appeal, readily available appeals, *Anders* briefs, post-conviction relief procedures, and direct appeals and post-conviction review in death penalty cases. All of this is followed by the availability of some federal habeas review. We therefore believe that fundamental error review is no longer necessary.

We affirm Defendant's convictions and sentences.

ZLAKET, C.J., JONES, V.C.J., and MOELLER, J., concur.

MARTONE, Justice, concurring.

I join the court in all but its fundamental error review dicta contained in its conclusion, *ante*, at 231, 934 P.2d at 795. The court says that it has not conducted a fundamental error review nor will it in future cases. We so held a year ago in *State v. Smith*, 184 Ariz. 456, 460, 910 P.2d 1, 5 (1996), where we said:

the procedural effect of that repeal [A.R.S. § 13–4035] applies retroactively to cases

not yet final. Thus, Smith is not entitled to fundamental error review.

In reliance upon that holding, we have not performed fundamental error reviews, unless they were undertaken before the effective date of the statute, in our capital cases here on direct appellate review. *See, e.g., State v. Rogovich,* 188 Ariz. 38, 932 P.2d 794, 800–01 (1997); *State v. Thornton,* 187 Ariz. 325, 335, 929 P.2d 676, 686 (1996); *State v. Miller,* 186 Ariz. 314, 328, 921 P.2d 1151, 1165 (1996).

The issue was thus decided in *Smith* and implemented in our cases. I do not see the need to revisit it now. It is not an issue raised by the defendant in this case.

But if it were otherwise thought important to repeat ourselves and say that we are not going to perform *sua sponte*[1] fundamental error review on direct appeal, then we ought to plainly acknowledge that the reason we are not doing it is that, as we held in *Smith,* the statute requiring it has been repealed. But today the court says that it is not going to perform *sua sponte* fundamental error review not only because of the repeal of the statute "but also on the realization that fundamental error review has outlived its necessity." *Ante,* at 231, 934 P.2d at 795. The court goes so far as to say that "the repeal of § 13–4035 does not preclude us from engaging in such a review where necessary to serve the ends of justice. Ariz. Const. art. VI, § 5(5)." *Id.* But article VI, § 5(5) of the Arizona Constitution is the source of our rule making power.[2] It provides no authority for the proposition that we may engage in *sua sponte* fundamental error review in the absence of a statute or rule requiring it.

We no longer conduct *sua sponte* fundamental error review because the law no longer requires it, not because we choose to discontinue it. This is properly a legislative decision to make.

1. I use the term *sua sponte* fundamental error review to distinguish it from two separate but related doctrines. *Sua sponte* fundamental error review was imposed solely by A.R.S. § 13–4035 and required us to read every item in the record with an eye towards looking for fundamental error. The statute having been repealed, we no longer do this. This is not to be confused with two other doctrines unaffected by the repeal of the statute. First, in criminal cases, we continue to review claims of error actually made on appeal but which were unpreserved at the trial level by a fundamental error standard. Second, if in the process of examining issues presented by

way of appeal we stumble across fundamental error, then we have the discretion to address it. Having just denied review in *State v. Taylor,* 187 Ariz. 567, 571–72, 931 P.2d 1077, 1081–82 (App. 1996), and *State v. Curry,* 187 Ariz. 623, 931 P.2d 1133, 1136–37 (App.1996), this court is unanimous on that point. Our only disagreement is the "cover to cover" *sua sponte* review which finds its beginning and end in A.R.S. § 13–4035.

2. The Supreme Court shall have the "[p]ower to make rules relative to all procedural matters in any court." Ariz. Const. art. VI, § 5(5).