26 P.3d 1118

STATE of Arizona, Appellee,

v.

John Edward SANSING, Appellant.

No. CR–99–0438–AP.

Supreme Court of Arizona,
En Banc.

July 2, 2001.

Maricopa County Public Defender, by Terry J. Adams, Deputy Public Defender and Spencer D. Heffel, Deputy Public Defender, Phoenix, Attorneys for John Edward Sansing.

Janet Napolitano, The Attorney General, by Kent E. Cattani, Chief Counsel, Capital Litigation Section and Monica Beerling Klapper, Assistant Attorney General, Phoenix, Attorneys for State.

## OPINION

McGREGOR, Justice.

¶ 1 On March 4, 1998, a grand jury indicted the defendant, John Edward Sansing, on four counts: first-degree murder, kidnaping, armed robbery, and sexual assault. The defendant pled guilty to all charges on September 18, 1998. Following a sentencing hearing, Judge Ronald S. Reinstein sentenced the defendant to death on September 30, 1999. Appeal to this court is automatic and direct when the court imposes a sentence of death. Ariz.Rev.Stat. (A.R.S.) § 13–703.01 (2001). We exercise jurisdiction pursuant to Article 6, Section 5.3 of the Arizona Constitution, A.R.S. section 13–4031, and Arizona Rule of Criminal Procedure 31.2.b.

## I.

¶ 2 On February 24, 1998, the defendant called the Living Springs Church and requested delivery of a food box for his family. He gave the church secretary his name and home address for the delivery. The defendant then telephoned his wife, Kara Sansing, at work several times, primarily to discuss how to obtain more crack cocaine for the two

of them to smoke. During these calls, the defendant informed his wife that he had obtained some crack cocaine, that he had smoked some of it and was saving the rest for her. He also told her that he had called a church and arranged for delivery of some food. When Kara Sansing returned home at approximately 3:20 p.m., the couple smoked the remaining crack cocaine. The defendant, in the presence of his four children, informed Kara of his plan to rob the person who came from the church with the food boxes so he could purchase more crack cocaine.

¶ 3 Trudy Calabrese left the Living Springs Church in her truck at approximately 4:00 p.m. She arrived at the Sansing home shortly thereafter, parked in front of the house, and delivered two boxes of food. Ms. Calabrese chatted with Kara Sansing in the kitchen while the defendant signed a receipt for the delivery. Before Ms. Calabrese could leave, the defendant grabbed her from behind and threw her to the dining room floor. Aided by his wife and with his children watching, the defendant bound her wrists while she cried, "Lord, please help me" and, "I don't want to die, but if this is the way you want me to come home, I am ready," and repeatedly asked the defendant's children to call the police. The defendant instructed his children to go into the living room and watch television.

¶ 4 Using a club, the defendant struck Ms. Calabrese in the head several times with force sufficient to break the club into two pieces and render her temporarily unconscious. Leaving her on the dining room floor, the defendant took her keys and moved her truck to a business parking lot nearby. At some point before he returned, Ms. Calabrese regained consciousness. Upon his return, the defendant dragged her into his bedroom and sexually assaulted her. Kara Sansing, who witnessed the rape, testified that she heard the defendant and Ms. Calabrese speaking during the rape. The defendant then fatally stabbed her in the abdomen three times with a kitchen knife. During the attack, the defendant placed a sock in Ms. Calabrese's mouth and secured two plastic bags over her head with additional cords and a necktie. According to the medical examiner, she lived several minutes after being stabbed. After the murder, the defendant left the bedroom and went to look out the dining room window to make certain no one had observed his actions.

¶ 5 The defendant then removed Ms. Calabrese's jewelry and left her body in his bedroom, covered with laundry, for several hours. The defendant engaged in two separate drug transactions shortly after the murder. First, he telephoned a drug dealer and arranged to trade the victim's rings for crack cocaine. Later, he arranged to trade her necklace for more crack cocaine.

¶ 6 Later in the evening, Pastor Becker from Living Springs Church called the Sansing home looking for Ms. Calabrese and spoke to the defendant. The defendant, giving a false address, told the pastor that she had never arrived.

¶ 7 Late that night, the defendant dragged Ms. Calabrese from the bedroom to the backyard and placed her body in a narrow space between the back of his shed and the fence. He covered her with a piece of old carpeting and other debris. At least three of the four Sansing children saw the body behind the shed. At some point, the defendant washed the bloody club and hid the clothes he had used to cover her body in a box in the bedroom.

¶ 8 The next day, searchers found Ms. Calabrese's truck in a parking lot near the Sansing home. Inside, they found a piece of paper with the Sansings' correct address. The police went to the Sansing home and discovered the victim's body behind the shed. The defendant, who had driven to his sister's house, admitted to her that he and his wife had killed Ms. Calabrese. Eventually, the defendant's father telephoned the police and reported the defendant's location. The defendant knew the police were coming and did not attempt to flee. When the police arrived, he submitted to custody peaceably and without resistance.

## II.

### A. Aggravating Factors

#### 1. Consideration of Character of the Victim

■ ¶ 9 The defendant asserts that the judge improperly based his sentencing deci-

sion on Ms. Calabrese's good character. In his special verdict, the judge referred to the victim as a "Good Samaritan" and as a person who "took great joy in helping people in need." The judge's concluding remarks, after considering all aggravating and mitigating factors, described Ms. Calabrese as a person who "stood out like a shining light, as a true Samaritan" and who "kept her faith in God to the end." The defendant argues that the judge imposed the death sentence because he viewed the victim as a person above the norm of other murder victims. That approach, he argues, violates A.R.S. section 13–703, which does not define the character of the victim as an aggravating factor, and discriminates on the basis of the victim's status. A.R.S. § 13–703.A H (2001).

¶ 10 We agree with the State that the judge's comments, taken in context, do not show that the trial judge relied upon the victim's good character in imposing the sentence. Taken in context, the comments merely state the judge's summary of the aggravating factors, particularly the senselessness of the crime and the helplessness of the victim. The fact that the victim was delivering food when attacked is related to the senselessness of the crime; the judge's comments related to "resorting to prayer for comfort" describe the helplessness of the victim after she had been beaten and bound.

¶ 11 The defendant relies on *Gerlaugh v. Lewis*, 898 F.Supp. 1388 (D.Ariz.1995), *aff'd* 129 F.3d 1027 (9th Cir.1997), to support his argument that imposing a death sentence based on the social or economic background of the victim or defendant supports a claim of discrimination. In *Gerlaugh*, the habeas petitioner alleged that Arizona's death sentence is "discriminately applied because the death penalty is more likely to be imposed if the victim is white and the defendant is a young male from a lower socio-economic background." *Gerlaugh*, 898 F.Supp. at 1416. The court stated that "[t]o prevail on an equal protection claim, Petitioner must prove 'that the decision-makers in *his* case acted with discriminatory purpose.'" *Id.* (citing *McCleskey v. Kemp*, 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987)). The defendant points to no facts that support a

finding that the trial judge acted with discriminatory purpose, and nothing in the special verdict suggests that the victim's social or economic background affected the judge's decision.

### 2. Pecuniary Gain as an Aggravating Factor

¶ 12 When a defendant commits murder "as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value," the court shall consider this an aggravating circumstance. A.R.S. § 13–703.F.5 (2001). To establish the F.5 factor, the State must prove beyond a reasonable doubt that pecuniary gain was "a motive, cause, or impetus for the murder and not merely the result of the murder." *State v. Kayer*, 194 Ariz. 423, 433 ¶ 32, 984 P.2d 31, 41 ¶ 32 (1999) (quoting *State v. Spears*, 184 Ariz. 277, 292, 908 P.2d 1062, 1077 (1996)), *cert. denied*, 528 U.S. 1196, 120 S.Ct. 1259, 146 L.Ed.2d 115 (2000). We conclude the court erred in finding the State established the F.5 factor in this matter.

¶ 13 The State, relying on *LaGrand* and *Greene*, argues that the defendant's overall motive was to rob the victim and "this desire infect[ed] all other conduct of the defendant." *State v. LaGrand*, 153 Ariz. 21, 35, 734 P.2d 563, 577 (1987); *State v. Greene*, 192 Ariz. 431, 439 ¶ 32, 967 P.2d 106, 114 ¶ 32 (1998), *cert. denied*, 526 U.S. 1120, 119 S.Ct. 1772, 143 L.Ed.2d 802 (1999). The State interprets the language from *LaGrand* too broadly and ignores relevant restrictions that apply when evaluating the F.5 aggravating factor. A murder committed in the context of a robbery or burglary is not per se motivated by pecuniary gain. Rather, we reserve the death penalty for murders committed during a robbery or burglary for those cases in which the facts clearly indicate a connection between a pecuniary motive and the killing itself; the expectation of pecuniary gain must be a motive for the murder.

¶ 14 We distinguish a murder that occurs during a robbery or burglary in which the expectation of pecuniary gain serves as a catalyst for the entire chain of events, including the murder, from a "robbery gone bad" or a robbery that occurs close in time to a

murder but that constitutes a separate event for the purpose of an F.5 determination. *State v. McKinney*, 185 Ariz. 567, 584, 917 P.2d 1214, 1231 (1996). "The existence of an economic motive at some point during the events surrounding a murder is not enough to establish" pecuniary gain as a motive. *State v. Medina*, 193 Ariz. 504, 513 ¶ 32, 975 P.2d 94, 103 ¶ 32 (1999). "There must be a connection between the motive and the killing." *Id.*

¶ 15 Whether the needed connection exists between expected pecuniary gain and the motive for killing involves a highly fact-intensive inquiry. The inquiry usually involves deciding whether a motive for the murder was to facilitate the taking of or the ability to keep items of pecuniary value. *See, e.g., State v. Smith*, 146 Ariz. 491, 501, 707 P.2d 289, 299 (1985) (defendant killed a convenience store clerk to gain access to the cash register; court found "[u]nder the facts of *this* case (but certainly not of all robberies) the commission of the killing necessarily carried with it the expectation of pecuniary gain"); *State v. Correll*, 148 Ariz. 468, 479, 715 P.2d 721, 732 (1986) (defendant robbed home of victims, then took victims to desert where he shot and killed them; court held that defendant "very carefully executed the armed robbery, and the murders were part of the scheme of robbery. The only motivation for the killings was to leave no witnesses to the robbery."); *State v. Hensley*, 142 Ariz. 598, 604, 691 P.2d 689, 695 (1984) (defendant executed the victims during the robbery of a bar; court found "the murders were a part of the overall scheme of the robbery with the specific purpose to facilitate the robbers' escape"); *LaGrand*, 153 Ariz. at 36, 734 P.2d at 578 (defendant stabbed the bank clerk when the clerk "frustrat[ed] defendant's continuing attempt for pecuniary gain"). *But see State v. Gillies*, 135 Ariz. 500, 512, 662 P.2d 1007, 1019 (1983) (defendant confessed that the purpose of murdering the rape victim was to eliminate her as a witness to her own rape, not to steal her credit cards and cash; court held "[w]ithout some tangible evidence, or strong circumstantial inference, it is not for the sentencing court to conclude that because money and items were taken, the purpose of the murder was pecuniary gain."). If the

State fails to show the needed connection between pecuniary gain and the motive for murder, the F.5 factor cannot be used as an aggravator. As we emphasized in *LaGrand*, an unexpected or accidental death that occurs during the course of or flight from a robbery, but which was not committed in furtherance of pecuniary gain, does not provide sufficient basis for an F.5 finding. 153 Ariz. at 35, 734 P.2d at 577. Similarly, the sole fact that a defendant takes items or money from the victim does not establish pecuniary gain as a motive for the murder. *See State v. Wallace*, 151 Ariz. 362, 368, 728 P.2d 232, 238 (1986). Even a conviction for robbery, during which a murder occurs, does not necessarily prove pecuniary gain as motivation for the murder. *See State v. Greenway*, 170 Ariz. 155, 164, 823 P.2d 22, 31 (1991); *State v. Carriger*, 143 Ariz. 142, 161, 692 P.2d 991, 1010 (1984). Although a factual finding of pecuniary gain as a motive may be based upon "tangible evidence or strong circumstantial inference," *State v. Hyde*, 186 Ariz. 252, 280, 921 P.2d 655, 683 (1996), a finding that pecuniary gain served as a motive is essential to establishing the F.5 factor.

¶ 16 The needed connection between expectation of pecuniary gain and a motive for murder often results from a finding that one of the defendant's motives in committing the murder was to facilitate the taking of or ability to retain items of pecuniary value. A review of prior decisions illustrates the distinction between those situations and "robberies gone bad."

¶ 17 For instance, in *LaGrand*, the defendant stabbed the victim twenty-four times when the victim was unable to open the bank safe. When evaluating the F.5 aggravating circumstance, we focused on the reason the defendant was present and the reason he stabbed the victim. LaGrand was present because he intended to rob the bank and killed the bank employee when the victim "frustrat[ed] defendant's continuing attempt for pecuniary gain." *LaGrand*, 153 Ariz. at 36, 734 P.2d at 578. While the defendant's action in *LaGrand* may not have been a rational method for achieving his pecuniary goal, a clear connection existed between the

desire for pecuniary gain and the motive for murder.

¶ 18 No comparable connection between pecuniary gain and motive for murder existed in *State v. Rienhardt*, 190 Ariz. 579, 951 P.2d 454 (1997), in which the murder took place in the context of a drug deal. The defendant held the victim as human collateral in exchange for either methamphetamine or payment of a debt. When a third party failed to return with either, the defendant killed the victim. The State, again relying on a broad interpretation of *LaGrand*, argued that the defendant's desire for drugs or money infected all other conduct. We rejected the State's argument and distinguished *LaGrand*:

> In *LaGrand*, the defendant came to rob, and killed the employee during the robbery itself. Here, while Rienhardt held his human collateral hostage in expectation of the receipt of something of pecuniary value, his decision to take Ellis to the desert and kill him signified the end of his expectation of receipt of anything of pecuniary value, because killing Ellis frustrated this purpose. The killing was also removed in time and place from the underlying drug deal that was supposed to have happened hours earlier . . . .

*Rienhardt*, 190 Ariz. at 591, 951 P.2d at 466.

¶ 19 *State v. Jones*, 197 Ariz. 290, 4 P.3d 345 (2000), *cert. denied*, —— U.S. ——, 121 S.Ct. 1616, 149 L.Ed.2d 480 (2001), provides another example of the needed connection between pecuniary gain and motive for murder. There, the evidence demonstrated that the defendant "began the robbery intending to murder anyone who happened to be in the store at the time." *Jones*, 197 Ariz. at 309 ¶ 56, 4 P.3d at 364 ¶ 56. We found that the defendant "murdered the individuals to facilitate the robberies and then escape punishment," stating:

> These murders were not "robberies gone bad." Instead, Jones and his co-defendant set out to accomplish the results they obtained, simply to acquire money. Thus, the F.5 factor applies and has been proven beyond a reasonable doubt.

*Id.*

¶ 20 In contrast to the defendant's motive in *Jones*, the defendant's motive in *State v.*

*Medina*, 193 Ariz. 504, 975 P.2d 94 (1999), had no apparent connection to his desire for pecuniary gain. In *Medina*, the defendant and two companions, in an effort to steal the victim's car, beat the victim, dragged him from his car, beat and kicked him again, and then repeatedly drove over him. We concluded, "while the reason for *beating* him may have been a desire to steal, the same is not necessarily true of the homicide." 193 Ariz. at 513 ¶ 30, 975 P.2d at 103 ¶ 30. Instead, the evidence suggested that it was just as likely the defendant acted for his own amusement. *Id.*

¶ 21 We have also found that a murder committed to facilitate escape and/or hinder detection by police furthers the pecuniary interest of the criminal. *See Greenway*, 170 Ariz. at 165, 823 P.2d at 32; *State v. Hoskins*, 199 Ariz. 127, 137 ¶ 87, 14 P.3d 997, 1017 ¶ 87 (2000) (finding F.5 present "[w]hen a robbery victim is executed to facilitate the killer's escape and hinder detection for the purpose of successfully procuring something of value"). In *Greenway*, the defendant murdered his victims execution-style after robbing their home. Greenway entered the home knowing the victims were present and made no attempt to disguise his identity; the practical effect of the murders was to eliminate the only witnesses to the crime. 170 Ariz. at 165, 823 P.2d at 32. We found "[t]he specific purpose of the murders was to facilitate defendant's escape and hinder detection, thereby furthering his pecuniary goal." *Id.*

¶ 22 The facts of this case do not establish that the expectation of pecuniary gain provided a motive for the murder. Although pecuniary gain certainly was a motive for the defendant's decision to beat and bind the victim, her rape and the murder appear to be separate events. Unlike *LaGrand* or the cases cited therein, this murder did not facilitate the taking or keeping of the stolen property. While the defendant's initial intention was to rob the victim, we cannot conclude that his motive for killing her was pecuniary in nature. *Cf. Medina*, 193 Ariz. at 513 ¶ 32, 975 P.2d at 103 ¶ 32 (concluding "[e]ven if the defendant's initial intention was to take the

**356**

car or radio, we cannot conclude that his motive for later running over and killing the victim was pecuniary gain"). The murder, which occurred at least an hour after the victim's arrival, did not facilitate the defendant's ability to secure pecuniary gain, particularly in light of the fact that he bound the victim almost as soon as she entered his home.

¶ 23 We also disagree with the State's assertion that the defendant committed this murder to facilitate escape and hinder detection by police. After the murder, the defendant left Ms. Calabrese in his bedroom for four to five hours, then placed her in the backyard where she was visible over a low fence. The next morning, without any further attempts to escape or evade detection, he left for work but instead drove to his sister's home, where he confessed to her. The defendant's father eventually summoned the police, who peaceably took the defendant into custody. Further, in distinction to the facts in *Greenway*, the defendant's decision to kill Ms. Calabrese did not eliminate the only witness to the crime: the defendant's wife and their children were present during the entire chain of events. The State did not prove beyond a reasonable doubt "a connection between the motive and the killing" related to pecuniary gain for the purpose of F.5. *Medina*, 193 Ariz. at 513 ¶ 32, 975 P.2d at 103 ¶ 32.

¶ 24 We conclude that the trial court erred in finding the State established the F.5 factor beyond a reasonable doubt.

### 3. Cruelty, Heinousness and Depravity as an Aggravating Circumstance

 ¶ 25 When a "defendant commit[s] the offense in an especially heinous, cruel or depraved manner," it shall be considered an aggravating circumstance. A.R.S. § 13–703.F.6 (2001). We have defined the terms used in F.6 as follows, "heinous: hatefully or shockingly evil: grossly bad. cruel: disposed to inflict pain esp. in a wanton, insensate or vindictive manner: sadistic. depraved: marked by debasement, corruption, perversion or deterioration." *State v. Knapp*, 114 Ariz. 531, 543, 562 P.2d 704, 716

(1977). We narrowly construe these terms to apply only to "killing[s] wherein additional circumstances of the nature enumerated above set the crime apart from the usual or the norm." *Id.* Because the statute is written in the disjunctive, the sentencing judge need find only one of the factors to establish an F.6 aggravating factor. *State v. Gretzler*, 135 Ariz. 42, 51, 659 P.2d 1, 10 (1983); *State v. Bolton*, 182 Ariz. 290, 312, 896 P.2d 830, 852 (1995) (cruelty alone is sufficient to support a finding of F.6); *State v. Gulbrandson*, 184 Ariz. 46, 68, 906 P.2d 579, 601 (1995) (heinousness or depravity alone is sufficient to support a F.6 finding).

#### a. Cruelty

 ¶ 26 To find cruelty, the court must find beyond a reasonable doubt that the victim was conscious during the attack and that the defendant knew or should have known that the victim would suffer. *See State v. Trostle*, 191 Ariz. 4, 18, 951 P.2d 869, 883 (1997). However, the victim need not be conscious for each and every wound inflicted. *See State v. Lopez*, 163 Ariz. 108, 115, 786 P.2d 959, 966 (1990). Further, cruelty can exist even if the victim remained conscious for only a short period during the attack. *State v. Van Adams*, 194 Ariz. 408, 421 ¶ 44, 984 P.2d 16, 29 ¶ 44 (1999), *cert. denied*, 528 U.S. 1172, 120 S.Ct. 1199, 145 L.Ed.2d 1102 (2000); *State v. Mann*, 188 Ariz. 220, 226, 934 P.2d 784, 790 (1997); *State v. Herrera*, 176 Ariz. 21, 34, 859 P.2d 131, 144 (1993); *State v. Rossi*, 146 Ariz. 359, 365, 706 P.2d 371, 377 (1985).

¶ 27 The judge made three specific findings at sentencing that relate to Ms. Calabrese's consciousness. First, the judge concluded that she was rendered unconscious by the blows to the head but later regained consciousness. Second, she suffered defensive wounds, indicating that she was conscious during the attack. Finally, she would not have died for several minutes after the defendant stabbed her.

¶ 28 The defendant contends that the evidence was insufficient to show that the victim was conscious long enough to suffer within the meaning of F.6. He argues that the only evidence of her consciousness came from

Kara Sansing, who had to be refreshed with an earlier interview during the sentencing hearing.

¶ 29 The defendant asks us to focus on the testimony of the medical examiner. The medical examiner, discussing the blunt force trauma that caused a large laceration on the back of Ms. Calabrese's head, expressed some doubt as to whether she could have regained consciousness. When asked directly, however, the medical examiner stated, "It is possible, yes. I wasn't there. Is it possible? Yes, but I doubt it." The State then asked the doctor if it was "medically unlikely or impossible" that the victim had a conversation with the defendant during the sexual assault, to which the doctor replied, "Not at all." The medical examiner also testified that if Ms. Calabrese had regained consciousness, the blows and resulting injuries would have been painful. These facts support the sentencing judge's findings.

¶ 30 Furthermore, Ms. Calabrese was conscious when the defendant grabbed her from behind and threw her, face down, into the carpet in the defendant's dining room. She was conscious while the defendant and his wife bound her wrists and ankles with extension cords. All four of the defendant's children reported that she said, "Lord, please help me." The defendant stipulated in his plea agreement that she was conscious when he returned from moving her truck. Finally, Kara Sansing testified that she heard Ms. Calabrese and the defendant talking during the sexual assault. The record is replete with evidence that the victim was conscious for at least part, if not the majority, of the attack.

¶ 31 The defendant also argues that the time frame between the beginning of the attack and Ms. Calabrese's loss of consciousness was too short to support a finding of cruelty. The defendant compares the facts of his case to other cases in which we upheld a finding of cruelty and asks us to distinguish his facts from those. *See, e.g., State v. Lavers*, 168 Ariz. 376, 814 P.2d 333 (1991) (defendant cut victims several times before stabbing them, and one of the victims saw his own mother stabbed in the back prior to murder); *State v. Walton*, 159 Ariz. 571, 769 P.2d 1017 (1989) (defendant drove victim to desert, forced victim to lie on ground while captors debated victim's fate); *State v. McCall*, 139 Ariz. 147, 677 P.2d 920 (1983) (armed defendants broke into victims' home, victims listened while defendant shot family members and waited for their turn).

¶ 32 We disagree that the time frame cannot support a finding of cruelty. This case closely resembles the factual situation in *State v. Mann*, 188 Ariz. 220, 934 P.2d 784 (1997). In *Mann*, the central issue with respect to the F.6 finding involved conflicting information regarding the consciousness of the victim. The defendant argued "that the medical examiner testified that [the victim] probably was conscious only for ten to twenty seconds and during that time may have been in a state of shock." *Mann*, 188 Ariz. at 226, 934 P.2d at 790. In contrast, an eyewitness testified that the victim was alive for three to five minutes. The trial judge and this court found the testimony of the eyewitness to be "more persuasive." *Id.* In the instant case, the medical examiner expressed doubt about the victim's consciousness after the blow that caused the large laceration but did not opine that consciousness was impossible. We find the testimony of the five eyewitnesses to be more persuasive than that of the medical examiner who admitted, "It is possible [that the victim did regain consciousness], yes. I wasn't there." The evidence provides substantial support for the sentencing judge's findings.

¶ 33 Furthermore, considering whether a victim had time to contemplate her ultimate fate, we have found cruelty present when the victim suffered for only a short time before death. All four of the defendant's children reported hearing Ms. Calabrese pray, "Lord, please help me." Kara Sansing testified hearing the victim say, "God please help me," and, "If this is the way you want me to come home, then I will come home." Additionally, Kara Sansing testified that the victim asked the defendant's children to call the police "about three, four times." The evidence shows beyond a reasonable doubt that the victim was aware and had sufficient time to contemplate her fate.

¶ 34 The finding of cruelty alone is sufficient to establish the F.6 aggravating factor. *State v. Clabourne*, 194 Ariz. 379, 384 ¶ 17, 983 P.2d 748, 753 ¶ 17 (1999), *cert. denied*, 529 U.S. 1028, 120 S.Ct. 1439, 146 L.Ed.2d 327 (2000); *State v. Bolton*, 182 Ariz. 290, 312, 896 P.2d 830, 852 (1995); *State v. Lopez*, 175 Ariz. 407, 411, 857 P.2d 1261, 1265 (1993). Because we concur with the sentencing judge's finding with respect to cruelty, we find it unnecessary to address the question of heinousness or depravity.

## B. Mitigating Factors

### 1. Statement by the Victim's Daughter

¶ 35 At sentencing, the judge considered and rejected the request of the victim's ten-year-old daughter for mercy as a mitigating circumstance. The defendant asserts the judge thereby violated the rights of a victim to be heard, as guaranteed by Article 2, Section 2.1.(A)4 of the Arizona Constitution, A.R.S. section 13–4426.A, and Arizona Rule of Criminal Procedure 39.b.7. The State responds that a victim's rights are satisfied when the court gives the victim a chance to speak, orally or in writing, at sentencing. *See Gulbrandson*, 184 Ariz. at 66, 906 P.2d at 599 ("The Victims' Bill of Rights of the Arizona Constitution, however, guarantees victims of crime the right '[t]o be heard at . . . sentencing.' [Citation omitted.] Here, the victim's family made statements at the sentencing hearing and in letters and statements attached to the presentence report.").

¶ 36 In *State v. Trostle*, we rejected the defendant's argument. There, the defendant "claim[ed] that the judge should have considered requests from the victim's family that he be sentenced to life imprisonment [rather than death]." 191 Ariz. 4, 22, 951 P.2d 869, 887 (1997). We disagreed, stating "such evidence is irrelevant to either the defendant's character or the circumstances of the crime and is therefore not proper mitigation." *Id.* (citing *State v. Williams*, 183 Ariz. 368, 385, 904 P.2d 437, 454 (1995)). Moreover, A.R.S. section 13–703.D expressly forbids the consideration of "any recommendation made by the victim regarding the sentence to be imposed."

¶ 37 In this case, the victim's rights were satisfied by the presence of Mr. Calabrese at the sentencing hearing and the court's acceptance of documents submitted by the victim's daughter. The judge correctly refused to consider the daughter's sentencing recommendation when imposing the sentence.

### 2. The Defendant's Childhood

¶ 38 The defendant proffered his difficult childhood and family background as non-statutory mitigating circumstances. At sentencing, the judge held that the defendant had established by a preponderance of the evidence that he had a difficult childhood and family background but declined to give the evidence "significant mitigating weight" because "there [was] nothing in the defendant's childhood or family background that provides a causal link to the horrific crime committed." The defendant argues the judge's refusal to give the evidence significant weight due to a lack of a causal nexus violates his due process and Eighth Amendment rights under *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989); *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); and *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

¶ 39 We have previously considered and rejected this argument. We have interpreted *Penry, Eddings,* and *Lockett* as directing the sentencing judge to "consider evidence proffered for mitigation." *State v. Djerf*, 191 Ariz. 583, 598 ¶ 61, 959 P.2d 1274, 1289 ¶ 61 (1998)(with respect to mitigating evidence, the sentencing judge is "entitled to give it the weight it deserves"); *see also State v. Towery*, 186 Ariz. 168, 189, 920 P.2d 290, 311 (1996) ("The sentencer therefore must consider the defendant's upbringing if proffered but is not required to give it significant mitigating weight."). However, "[h]ow much weight should be given proffered mitigating factors is a matter within the sound discretion of the sentencing judge." *Towery*, 186 Ariz. at 189, 920 P.2d at 311.

¶ 40 "Arizona law states that a difficult family background is not relevant unless the defendant can establish that his family

experience is linked to his criminal behavior." *Djerf*, 191 Ariz. at 598 ¶ 61, 959 P.2d at 1289 ¶ 61; *see also State v. Hoskins*, 199 Ariz. 127, 151 ¶ 110, 14 P.3d 997, 1021 ¶ 110 (2000)(Family dysfunction "can be mitigating only when actual causation is demonstrated between early abuses suffered and the defendant's subsequent acts."); *Towery*, 186 Ariz. at 189, 920 P.2d at 311 ("family background may be a substantial mitigating circumstance when it is shown to have some connection with the defendant's offense-related conduct"); *State v. Wallace*, 160 Ariz. 424, 427, 773 P.2d 983, 986 (1989) ("A difficult family background is a relevant mitigating circumstance if a defendant can show that something in that background had an effect or impact on his behavior that was beyond the defendant's control."). No testimony suggested that the defendant's childhood affected his behavior on the day of the murder. The evidence on this subject did not "prove a loss of impulse control or explain what caused him to kill." *Towery*, 186 Ariz. at 189, 920 P.2d at 311. The sentencing judge properly considered the defendant's difficult childhood as a non-statutory mitigating circumstance and gave the evidence appropriate weight.

### 3. Impaired Capacity

¶ 41 If "[t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution," the court can consider the impaired capacity as a mitigating circumstance. A.R.S. § 13–703.G.1 (2001). A defendant bears the burden of establishing the existence of any statutory mitigating circumstance by a preponderance of the evidence. Because the statute is written in the disjunctive, proof of either attribute is sufficient to find G.1. *See State v. Rossi*, 154 Ariz. 245, 251, 741 P.2d 1223, 1229 (1987). The judge first should consider proffered evidence to determine whether it satisfies the statute, and, if it does not, evaluate the evidence as a non-statutory mitigating factor. *See, e.g., State v. Vickers*, 129 Ariz. 506, 515–16, 633 P.2d 315, 324–25 (1981).

¶ 42 The defendant argues that his behavior and the testimony of his wife, sister, mother, and brother prove by a preponderance of the evidence that he was significantly impaired at the time of the murder. Kara Sansing testified that her husband sounded "hyped up" and "anxious" on the telephone when he called her to plan the attack. She further testified that when she arrived home the defendant was "not acting himself" and described the defendant as "cold," "in another world," and "spaced out" during the commission of the crime. Finally, Kara testified that she had observed her husband on drugs previously and had never seen him react as he did on the day of the murder. The defendant's sister described her brother as "someone taken by the drugs he had been doing." She described his demeanor as "nervous" and "uptight." The defendant's mother stated that the defendant had "let drugs take over his life." The defendant's older brother agreed that drugs "just took over his life."

¶ 43 The State argues the defendant's actions before and after the murder reveal that his abuse of crack cocaine prior to the murder did not so significantly impair his ability to appreciate his conduct as to establish the G.1 mitigator. The State does not, however, contest the use of the information as non-statutory mitigating evidence. In arguing the defendant did not establish the statutory factor, the State points out that the defendant planned his attack and then phoned his wife to discuss it. After the murder, the defendant repeatedly looked out the window to determine whether anyone had seen him. After beating and binding the victim, the defendant moved the victim's truck so it would not be seen in front of his house. Shortly after the murder, the defendant completed two drug transactions. When Ms. Calabrese's church telephoned, the defendant lied about his address. In addition, the defendant cleaned the club used to beat the victim, and hid it in a box in his bedroom. The next morning, the defendant fled to his sister's home and told her what he had done. While it is undisputed that the defendant had ingested crack cocaine on the day of the murder and for several days prior to the crime, the evidence regarding his actions before, during, and after shows he maintained

the ability to appreciate the wrongfulness of his actions and to conform his conduct to the requirements of the law within the meaning of G.1.

¶ 44 The sentencing judge concluded that "[t]he defendant's actions before, during and after the murder, demonstrate[d] that neither his capacity to appreciate the wrongfulness of his conduct nor his capacity to conform his conduct to the requirements of the law was *significantly* impaired at the time he murdered Trudy Calabrese." *See State v. Rienhardt*, 190 Ariz. 579, 591–92, 951 P.2d 454, 466–67 (1997) (when evidence shows that the defendant took steps to avoid prosecution shortly after the murder, the claim of impairment fails). Upon review of the evidence, we agree that the defendant did not establish the existence of the statutory mitigating circumstance by a preponderance of the evidence. We also agree that the sentencing judge properly considered the evidence as non-statutory mitigation but that the lack of causal nexus justifies giving this factor limited mitigating value.

### C. Independent Reweighing

¶ 45 As directed by statute, we "independently review the trial court's findings of aggravation and mitigation" to determine the propriety of a death sentence. A.R.S. § 13–703.01.A (2001). "The process of weighing or reweighing aggravating and mitigating circumstances is not scientific, but, rather, inherently subjective." *State v. Hoskins*, 199 Ariz. 127, 151 ¶ 123, 14 P.3d 997, 1024 ¶ 123 (2000). While we disagree with the sentencing judge's finding of a pecuniary motive, we agree that the State proved beyond a reasonable doubt that the defendant committed this murder in an especially cruel manner. In contrast, the defendant failed to establish any statutory mitigating circumstances, and the judge gave the defendant's difficult family background little mitigating weight because the defendant failed to establish the required causal link. Given the strength of the aggravating factor in this case and the minimal value of the mitigating evidence, we conclude the judge appropriately imposed a sentence of death.

### III.

¶ 46 We have previously rejected the following challenges to the constitutionality of the Arizona death sentencing scheme:

A. The defendant claims denial of a jury trial violated his rights under the Fourteenth Amendment Equal Protection Clause because defendants in non-capital cases are permitted to have juries determine aggravating factors. The United States Supreme Court and this court have rejected this argument. *Walton v. Arizona*, 497 U.S. 639, 648, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990); *State v. Landrigan*, 176 Ariz. 1, 6, 859 P.2d 111, 116 (1993); *see also Clark v. Ricketts*, 958 F.2d 851, 859 (9th Cir.1992).

B. The defendant argues Arizona's death penalty scheme violates the Eighth Amendment by insufficiently channeling the sentencer's discretion. We previously rejected this argument. *See, e.g., State v. West*, 176 Ariz. 432, 449, 862 P.2d 192, 209 (1993) ("Federal cases hold that Arizona's capital sentencing scheme, as construed by this court, does narrow the class of death eligible defendants sufficiently to comply with the Eighth Amendment."), *overruled on other grounds, State v. Rodriguez*, 192 Ariz. 58, 961 P.2d 1006 (1998).

C. The defendant asserts that recent decisions by the Supreme Court raise doubt about the validity of judge sentencing in capital cases, upheld in *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). *See Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); *Castillo v. United States*, 530 U.S. 120, 120 S.Ct. 2090, 147 L.Ed.2d 94 (2000); *Jones v. United States*, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999). This question is not one that may be answered by this court. *See State v. Ring*, 200 Ariz. 267, 278–279, 25 P.3d 1139, 1150–1151 ¶¶ 40–44 (2001).

D. Issues Raised by the Defendant to Preserve for Appeal

1. The death penalty is per se cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. Re-

jected in *State v. Gulbrandson,* 184 Ariz. 46, 72–73, 906 P.2d 579, 605–606 (1995).

2. Execution by lethal injection is cruel and unusual punishment. Rejected in *State v. Spears,* 184 Ariz. 277, 291, 908 P.2d 1062, 1076 (1996).

3. Arizona's death penalty statute is unconstitutional because it requires death wherever an aggravating circumstance and no mitigating circumstances are found. Rejected in *State v. Bolton,* 182 Ariz. 290, 310, 896 P.2d 830, 850 (1995).

4. Arizona's death penalty statute is unconstitutional because the defendant does not have the right to death qualify the sentencing judge. Rejected in *Spears,* 184 Ariz. at 291, 908 P.2d at 1076.

5. Arizona's death penalty statute fails to provide guidance to sentencing court. Rejected in *Spears,* 184 Ariz. at 291, 908 P.2d at 1076.

6. Arizona's death penalty statute violates the Eighth and Fourteenth Amendments and Article 2, Sections 4 and 15 of the Arizona Constitution because it does not require multiple mitigating factors to be considered cumulatively or require the trial court to make specific findings as to each mitigating factor. Rejected in *State v. Van Adams,* 194 Ariz. 408, 423 ¶ 55, 984 P.2d 16, 31 ¶ 55 (1999), *cert. denied,* 528 U.S. 1172, 120 S.Ct. 1199, 145 L.Ed.2d 1102 (2000).

7. Arizona's death penalty statute is constitutionally defective because it fails to require the State to prove that death is appropriate. Rejected in *Spears,* 184 Ariz. at 291, 908 P.2d at 1076.

8. Arizona's death penalty statute is unconstitutional because the aggravating factor of cruel, heinous or depraved is vague and fails to perform its necessary function under the Eighth and Fourteenth Amendments. Rejected in *Gulbrandson,* 184 Ariz. at 72, 906 P.2d at 605.

9. The Arizona statutory scheme for consideration of mitigating evidence is unconstitutional because it limits full consideration of that evidence. Rejected in *Spears,* 184 Ariz. at 291, 908 P.2d at 1076.

10. The prosecutor's discretion to seek the death penalty is unconstitutional because it lacks standards. Rejected in *Spears,* 184 Ariz. at 291, 908 P.2d at 1076.

11. The death sentence has been applied discriminatorily in Arizona against poor males whose victims have been Caucasian, in violation of the Eighth and Fourteenth Amendments and Article 2, Sections 13 and 15 of the Arizona Constitution. Rejected in *State v. Stokley,* 182 Ariz. 505, 516, 898 P.2d 454, 465 (1995).

12. A proportionality review of a defendant's death sentence is constitutionally required. Rejected in *Gulbrandson,* 184 Ariz. at 73, 906 P.2d at 606.

**IV.**

¶ 47 For the foregoing reasons, we affirm the defendant's convictions and sentences.

CONCURRING: THOMAS A. ZLAKET, Chief Justice, CHARLES E. JONES, Vice–Chief Justice, STANLEY G. FELDMAN, Justice.

MARTONE, Justice, concurring.

¶ 48 I write separately to affirm the trial judge's findings that pecuniary gain was a motive for this murder, and that Sansing committed this murder in an especially heinous or depraved manner. In all other respects, I join the court's opinion and judgment.

**I.**

¶ 49 The court acknowledges that Sansing planned to rob the person who delivered the food boxes so he could purchase more crack cocaine. *Ante,* ¶ 2. It also acknowledges that he removed the victim's jewelry from her body and traded it for more crack cocaine. *Ante,* ¶ 5. Yet the court concludes that "[a]lthough pecuniary gain certainly was a motive for the defendant's decision to beat and bind the victim, her rape and the murder appear to be separate events." *Ante,* ¶ 22. I believe the evidence is to the contrary. As the trial court noted, Sansing called the victim's church seeking food and assistance for his family, "all the while planning to rob the

unsuspecting Good Samaritan who delivered the food, so that he could purchase crack cocaine." Special Verdict, Sept. 30, 1999, at 4. When she arrived, he robbed her of a small amount of money and her jewelry and then twice traded pieces of her jewelry for crack cocaine. *Id.* Sansing said that he had to rape the victim so that it would look like a robbery, beating, and rape. *Id.* at 8. Thus the beating, rape, and the murder of the victim were all part of the same plan to get money to buy cocaine. In my view, therefore, it cannot be said that pecuniary gain was a motive for the beating and the rape, but not for the murder.

¶ 50 The court says that the murder "did not facilitate the defendant's ability to secure pecuniary gain." *Ante,* ¶ 22. But this confuses pecuniary gain with senselessness. It is true that Sansing did not have to kill her to get her money. This just shows that the murder was senseless within the meaning of *State v. Ross,* 180 Ariz. 598, 605, 886 P.2d 1354, 1361 (1994), because the murder was unnecessary to allow the defendant to complete his objective. In *Ross,* we upheld both pecuniary gain and senselessness. *See also State v. Lee,* 189 Ariz. 608, 619, 944 P.2d 1222, 1233 (1997); *State v. Hyde,* 186 Ariz. 252, 281, 921 P.2d 655, 684 (1996). The same is true here. Sansing did not have to kill to get the money (and therefore the crime is senseless), but he did kill to get the money (and therefore a motive was pecuniary gain). Indeed, on the facts of this case, pecuniary gain is the only motive for this senseless murder. *See State v. Rienhardt,* 190 Ariz. 579, 591, 951 P.2d 454, 466 (1997) ("In *LaGrand,* the defendant came to rob, and killed the employee during the robbery itself."); *State v. Medina,* 193 Ariz. 504, 518, 975 P.2d 94, 108 (1999) (Martone, J., concurring in part, dissenting in part) ("In *Rienhardt,* we said that *LaGrand* did not apply because Rienhardt did not 'come to rob.'"). The evidence here shows beyond all reasonable doubt that Sansing's motivation before, during, and after the killing was to obtain something of value to exchange for cocaine.

## II.

¶ 51 Having found that this murder was especially cruel, the court found it unneces-sary to address the question of heinousness or depravity. *Ante,* ¶ 34. While it may be unnecessary to address it, I believe it is very desirable to do so. First, where cruelty, heinousness, and depravity are present the (F)(6) factor is the stronger for it. Second, the heinousness and depravity of this crime are so evident, we should not let anyone wonder why we do not acknowledge this. Judge Reinstein found that "the *Gretzler* factors of gratuitous violence, senselessness and helplessness all exist in this case and that the state has proved beyond a reasonable doubt that the defendant committed the murder in an especially heinous or depraved manner." Special Verdict at 9. Gratuitous violence is violence beyond that necessary to kill. Judge Reinstein noted that Sansing hit the victim so hard that the club broke in two pieces. He hogtied her ankles and wrists and brutally raped her. He stabbed her not once but three times and ground the butcher knife into her. As if this were not enough, he tried to suffocate her. As this experienced trial judge noted, the rape itself was gratuitous violence and absolutely unnecessary to kill her.

¶ 52 The trial judge found that the victim was made completely helpless by being attacked, then hogtied. And he found that the killing was senseless because it was completely unnecessary to accomplish his goal of robbing the victim. Special Verdict at 9.

¶ 53 I believe all of these findings are unassailable and our failure to address them as a court introduces an element of needless uncertainty. In all other respects, I join the court's opinion in affirming Sansing's convictions and sentences.